2024 IL App (1st) 221125-U

No. 1-22-1125

Order filed June 5, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 4016 |
| | ) | |
| PEDRO CORRAL, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAN TINE delivered the judgment of the court.
Justices Lampkin and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We reverse the dismissal of defendant's postconviction petition and remand for an evidentiary hearing on his claim of actual innocence when another offender's affidavit averring that defendant was not present at the scene of the offenses constituted newly discovered, material, noncumulative evidence of such a conclusive character as to probably change the result at retrial.

¶ 2    Defendant Pedro Corral was convicted of first degree murder. He appeals from the circuit court's dismissal, on the State's motion, of his petition for relief filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2020)). On appeal, defendant

contends that the court erred in dismissing the petition when it made a substantial showing of actual innocence based upon another offender's affidavit averring that defendant was not present at the offenses. We reverse and remand for an evidentiary hearing on defendant's actual innocence claim.

¶ 3    The facts of this case were detailed in our prior opinion deciding defendant's direct appeal, and we include only those facts necessary to understand and resolve this appeal. See *People v. Corral*, 2019 IL App (1st) 171501.

¶ 4    Defendant, Luis Alfaro, and Anthony Guedes were charged by indictment with first degree murder, armed robbery, home invasion, and residential burglary arising from the shooting death of Giovanni Galindo on September 5, 2014.[1] After the trial court granted motions for severance, defendant's case proceeded to a jury trial on five counts of first degree murder.

¶ 5    Jose "Angel" Vargas testified that on the afternoon of September 5, 2014, he received a text from Alfaro, who wanted to purchase a half pound of cannabis. Vargas called Galindo to arrange the sale. During Vargas' subsequent communication with Alfaro, Alfaro stated that the purchase was for a 16-year-old friend. However, when Vargas spoke to the alleged buyer, he sounded like a "full grown man." That afternoon, Vargas went to an alley behind a gas station where two males entered Vargas' vehicle. A bigger, heavier man, later identified as Anthony, sat in the front passenger seat and a younger "kid" sat in the back seat.

---

[1]The trial evidence references another individual with the last name Guedes. For clarity, we refer to Anthony Guedes by first name.

¶ 6     The State then asked Vargas to look around the courtroom and identify the younger "kid." Vargas asked, "[w]ould he be back there?" The court instructed Vargas to step into the middle of the courtroom and look around. Vargas then identified defendant as the younger man.

¶ 7     Vargas testified he drove to Galindo's home, located at 62nd Street and Kilpatrick Avenue in Chicago. Once there, Vargas called Galindo, who said to walk to the back to "get it done." Vargas, Anthony, and defendant exited the vehicle. Although Vargas offered to go inside and retrieve the cannabis, Anthony declined because he wanted to examine it to ensure its quality so that defendant could sell it. Vargas called Galindo, who told them to enter the house through the alley. The men reentered Vargas' vehicle, which he drove into the alley and parked in front of Galindo's garage.

¶ 8     Vargas, defendant, and Anthony then walked to the basement door. Galindo opened the door. Once inside, Galindo handed Anthony a jar of cannabis. Anthony handed defendant a sample, which defendant examined and approved. Anthony then tried to negotiate a lower price. When Galindo declined, Anthony told defendant to "pay him." At this point, Vargas heard something being "clock[ed] back" and saw defendant holding a firearm. Galindo lunged toward Anthony and defendant. Vargas ran, but stopped when he heard three to five gunshots. When he looked, he saw Galindo on the floor covered in blood. Vargas called 911.

¶ 9     Vargas told responding police officers that he heard gunshots while walking in the alley and described two men whom he said he saw running. At trial, Vargas asserted that he gave the officers accurate descriptions of defendant and Anthony. On September 10, 2014, Vargas spoke to officers again and told the "actual truth" after being confronted with certain cell phone data.

Thereafter, on separate occasions, Vargas identified Anthony and defendant in photographic arrays. He also identified defendant in a physical line-up as the person with the firearm.

¶ 10    During cross-examination, Vargas acknowledged that, when asked to identify the 16-year-old in court, he initially pointed to the gallery where another 16-year-old was sitting. He stated that the person in the gallery looked like defendant. Then, when Vargas moved, he identified defendant. Vargas also acknowledged that, from where he was standing when he observed the firearm, he could not see defendant's face but Vargas knew it was "his body." At the time, Vargas did not know that the older man was Anthony; rather, he only knew a phone number.

¶ 11    During redirect, Vargas indicated that a screen initially blocked the area where defendant was seated. But that, after moving, Vargas could see the entire courtroom. The person in the audience was "[j]ust a 16 year old" and Vargas did not identify him. During redirect, Vargas stated that "this" was all he could see, and he thought "maybe" defendant would be "sitting right there." However, when he stepped into the middle of the courtroom, he had a "full view of everything."

¶ 12    Additional evidence established that DNA analysis conducted on blood swabs collected from the crime scene revealed a match to Galindo's DNA, and that two latent fingerprints, those of Anthony and his girlfriend, were found on jar lids recovered from the crime scene.

¶ 13    Chicago police detective Roger Murphy testified that after reviewing Galindo's cell phone, he learned that the number associated with "Angel" in Galindo's phone was the same number Vargas had provided to Murphy at the crime scene. During a subsequent conversation with Vargas, Murphy obtained phone numbers for Alfaro and the "husky, 30-year old male Hispanic" with whom Vargas arranged the cannabis sale. After speaking to Alfaro, Murphy learned Anthony's

name, and created a photographic array which he showed to Vargas. Vargas identified Anthony as the "husky" Hispanic man. Anthony was arrested in Florida in January 2015.

¶ 14    On October 22, 2014, during a conversation with another officer, Murphy learned of a person named "Flaco" and received a photograph. The following day, he obtained the name "Pedro Corral" and obtained a photograph. He then created a photographic array, which he showed to Vargas. Vargas identified defendant as the person who shot Galindo. Vargas later identified defendant in a line-up.

¶ 15    During cross-examination, Murphy acknowledged that defendant's fingerprints and DNA were not found at the crime scene. Although the investigation identified defendant's two phone numbers, as well as phone numbers associated with his parents, there was no evidence of those phone numbers interacting with the numbers of Vargas, Anthony, and Alfaro.

¶ 16    Defendant testified that he was 16 years old on September 5, 2014. That day, he was at home in Burbank until 4 p.m., when family member Ruben Quiroga drove him to his aunt's home. Defendant was there from 5 p.m. until 9 p.m. He denied knowing Anthony, but used to play baseball with an individual named Isaiah Guedes.

¶ 17    During cross-examination, the State showed defendant a portion of his videotaped interview with police, during which, according to the State, an officer asked whether defendant knew "Guedes," and he responded "Anthony, yeah."[2] At trial, defendant denied hearing that "part." He acknowledged that his grandmother and childhood friends called him "Flaco." During redirect, defendant stated that he did not hear himself say "Anthony" when listening to the videotaped statement and that he was not shown a picture of Anthony during the interview.

_____

[2]This videotape is not included in the record on appeal.

¶ 18     Quiroga testified that he picked defendant up between 4:30 and 4:45 p.m. in Burbank and then drove to Pilsen. Angelica Corral, who was married to defendant's uncle, testified that defendant arrived at her home around 5:30 p.m. Defendant's mother, Rosalva Corral, testified that she picked defendant up after 9 p.m. and that she did not know Anthony.

¶ 19     In rebuttal, the State presented Murphy, who testified that, when asked if he knew "Guedes," defendant answered "Anthony, yeah." The defense then asked whether defendant said, "I think, yeah." Murphy asserted that defendant said, "Anthony, yeah." In surrebuttal, defendant testified that when asked whether he knew "Guedes," he stated, "I think, yeah."

¶ 20     The jury found defendant guilty of first degree murder and that he personally discharged a firearm that proximately caused Galindo's death. Following a hearing, the trial court imposed a 31-year prison term. We affirmed on direct appeal. See *Corral*, 2019 IL App (1st) 171501.

¶ 21     On February 10, 2020, defendant filed, through counsel, the instant postconviction petition alleging, relevant here, a claim of actual innocence based upon Anthony's attached affidavit. The petition asserted that Anthony's affidavit was newly discovered, material, noncumulative evidence which warranted an evidentiary hearing. In an October 22, 2019, affidavit, Anthony stated:

> "I am not personally acquainted with anyone named Pedro Corral.
>
> On September 5, 2004, I was not in the company of anyone named Pedro Corral at or near 6212 S[.] Kilpatrick, Chicago[,] Illinois.
>
> No one named Pedro Corral had anything to do with the events that occurred at the above time and place and for which I am incarcerated."[3]

---

[3]The record on appeal has been supplemented with documents establishing that, following a jury trial, Anthony was found guilty of armed robbery and sentenced to 23 years in prison.

¶ 22    The circuit court docketed the petition for second stage proceedings. On January 26, 2021, the State filed a motion to dismiss alleging, in pertinent part, that Anthony's affidavit was cumulative evidence of defendant's alibi. The State noted that the affidavit had the wrong date for the offenses, that Anthony did not assert that he would have exercised his fifth amendment right had defendant sought his testimony prior to trial, and that rather than averring that he did not know defendant, Anthony merely averred that he did not know "Pedro Corral." The State concluded that the affidavit did not place the trial evidence, which included Vargas' identification of defendant, in a different light.

¶ 23    On December 20, 2021, the circuit court held argument on the State's motion. The State argued that defendant also went by "Flaco," such that it was possible that Anthony's statement that he did not know "Pedro Corral" was not conclusive. Postconviction counsel responded that because the trier of fact did not hear evidence from one of the offenders that "Pedro Corral" was not present at the offenses, the affidavit was new, material evidence, that had some possibility of changing the outcome at trial. The court granted the State's motion, finding that the affidavit was cumulative of the alibi testimony at trial.

¶ 24    On June 30, 2022, the court heard argument on defendant's motion to reconsider. The defense argued that Anthony, who was tried for the same offenses, had the right to not incriminate himself, resulting in his affidavit "only coming forward now." Therefore, his potential testimony was not cumulative of any trial evidence; rather, it was "totally new" and from outside the trial record. The State responded that the affidavit did not place "anything in context," did not state that Anthony was present during the offenses and included the wrong date, and therefore did not support a claim of actual innocence. The court denied the motion to reconsider.

¶ 25    On appeal, defendant contends that the circuit court erred by granting the State's motion to dismiss when his postconviction petition made a substantial showing of actual innocence. He contends that Anthony's affidavit is newly discovered, material, noncumulative evidence of such a conclusive nature as to affect the outcome at retrial. Defendant notes that Anthony, who was convicted of armed robbery arising out of Galindo's death, averred that he was present at the offenses but that defendant was not.

¶ 26    The Act provides a three-stage procedure through which a defendant can assert a substantial denial of his rights under the federal or state constitution. See 725 ILCS 5/122-1 *et seq*. (West 2020). Here, the petition was dismissed at the second stage of proceedings. During the second stage, a defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Domagala*, 2013 IL 113688, ¶ 35. When the State moves to dismiss the petition, all well-pleaded factual allegations not positively rebutted by the record must be taken as true. *People v. Sanders*, 2016 IL 118123, ¶ 42. Credibility is not an issue at the second stage of postconviction proceedings. *Id.* We review the dismissal of a postconviction petition at the second stage *de novo*. *Id.* ¶ 31.

¶ 27    Defendant's sole contention on appeal is that the petition made a substantial showing of actual innocence based upon Anthony's affidavit. We agree.

¶ 28    To succeed on a postconviction claim of actual innocence, a defendant must present new, material, noncumulative evidence of such a conclusive character as to probably change the result at retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47. Newly discovered evidence is evidence which was discovered after trial and that a defendant could not have discovered earlier through the exercise of diligence. *Id.* Evidence is material if it is relevant and probative of a defendant's

innocence. *Id.* Noncumulative means that the evidence adds to the information that the fact finder heard at trial. *Id*. Conclusive means that the evidence, when considered along with the trial evidence, would probably lead to a different result. *Id.* "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Id.*

¶ 29    Initially, the State argues that Anthony's affidavit is not newly discovered because the facts therein—that defendant was not at the crime scene—were known to defendant at the time of trial. We disagree.

¶ 30    Our supreme court has held that codefendants' statements qualify as newly discovered since "no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination." See *People v. Molstad*, 101 Ill. 2d 128, 134-35 (1984). Here, Anthony was charged alongside defendant with first degree murder and armed robbery. The cases were severed and, following a jury trial, Anthony was found not guilty of first degree murder and guilty of armed robbery. Defendant could not compel Anthony to place himself at the crime scene and exonerate defendant at the expense of implicating himself. Therefore, Anthony's affidavit is newly discovered evidence. See *People v. Edwards*, 2012 IL 111711, ¶ 38 (a codefendant's self-incriminating affidavit was newly discovered because he could not be compelled to incriminate himself, and "[n]o amount of diligence could have forced him to violate that right if he did not choose to do so").

¶ 31    Moreover, Anthony's allegations are material because, if they are true and believed by a jury, they would undermine the State's evidence of guilt and would tend to show defendant's innocence. See *People v. Coleman*, 2013 IL 113307, ¶ 96 ("Material means the evidence is relevant

and probative of the petitioner's innocence."). Anthony's allegations are also noncumulative, as the trial record does not otherwise contain this account of events.

¶ 32     Finally, Anthony's proposed testimony that he did not know defendant and that defendant was not at the scene of the offenses was of such a conclusive character as to probably change the result at retrial. As discussed, "[t]he conclusive character of the new evidence is the most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 33     Our supreme court has explained that, when analyzing conclusiveness, "the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. As such, the question is not whether the new evidence conflicts with the trial evidence, but whether it is "positively rebutted" by the trial record. See *id.* ¶ 60. Evidence is "positively rebutted" when it is "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* For example, an assertion that a victim had been shot only once was positively rebutted by autopsy evidence at trial establishing that the victim had been shot twice and died of multiple gunshot wounds. *Id.* ¶ 59 (discussing *Sanders*, 2016 IL 118123, ¶ 48).

¶ 34     Here, Anthony's affidavit is of such a conclusive nature as to change the result at a retrial. Anthony was convicted of armed robbery in connection with Galindo's death, and the evidence at defendant's trial revealed that Anthony's latent fingerprint was recovered from the crime scene. Although Vargas identified defendant as the shooter, Vargas initially lied to police about his involvement. Moreover, no physical evidence linked defendant to the crime scene and defendant and his family members testified in support of an alibi defense at trial. Accordingly, the version of

events set forth in Anthony's affidavit, *i.e.*, that defendant was not present at the offenses, is not positively rebutted by the record. Rather, a fact finder could accept Anthony's assertion that defendant was not present. See *id.* ¶ 60. As such, the affidavit places the trial evidence in a different light and undermines confidence in the judgment of guilt. See *id.* ¶ 48.

¶ 35    The State contends that Anthony's affidavit is immaterial and irrelevant because it contained the wrong date and merely stated that "Pedro Corral" was not present or involved. The State posits that Anthony may have known defendant as Flaco rather than by his legal name. As the affidavit did not indicate whether Anthony verified his knowledge of defendant's "actual physical identity," the State posits the affidavit is incapable of changing the outcome on retrial.

¶ 36    The offenses occurred on September 5, 2014. Anthony averred that he was "not personally acquainted with anyone named Pedro Corral," and that on "September 5, 2004," Anthony "was not in the company of anyone named Pedro Corral at or near" the location of the offenses. Moreover, "Pedro Corral" did not have "anything to do with the events that occurred at the above time and place and for which [Anthony was] incarcerated." Although the year is wrong in Anthony's affidavit, the month, date, and street location of the offenses are correct. The affidavit refers to the events which took place on September 5 at a certain location that resulted in Anthony's incarceration. Moreover, the fact that defendant also went by the nickname Flaco is not fatal to Anthony's identification of defendant by his legal name. Reading Anthony's affidavit in conjunction with defendant's petition and "construed in light of the record," it is not unreasonable to conclude that the "Pedro Corral" to whom Anthony refers is defendant. See *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 110.

¶ 37    The State also contends that Anthony's affidavit was cumulative of the defense testimony at trial which asserted that defendant was not at the "scene at the time of the murder" and merely contradicts the evidence presented at trial. We disagree.

¶ 38    Contrary to the State's assertion, Anthony's proposed testimony does not provide the same information as the defense witnesses. At trial, defendant and his family members testified that he was at a family event. Anthony's affidavit, on the other hand, avers that defendant was not at the crime scene.

¶ 39    Moreover, while the State argues that defendant seeks to "reassess the strength" of the State's case by attacking Vargas' credibility when his "credibility and reliability were resolved on direct appeal," at the second stage of proceedings we must accept the new evidence as true, unless it is positively rebutted by the record. See *Sanders*, 2016 IL 118123, ¶ 48; see also *People v. Coleman*, 183 Ill. 2d 366, 385 (1998) ("At the dismissal stage of a post-conviction proceeding, all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true."). It is for the circuit court, at the third stage of proceedings, to determine issues of credibility and the weight to be afforded evidence, as well as resolve evidentiary conflicts. See *Domagala*, 2013 IL 113688, ¶ 34.

¶ 40    Here, Anthony's allegations that defendant was not at the scene of the offenses for which Anthony is incarcerated are not positively rebutted by the record. While his allegation that defendant was not present conflicts with Vargas's identification of defendant as the shooter, that is to be expected. Accordingly, Anthony's allegations that he did not know defendant and that defendant was not present during the offenses placed the trial evidence in a different light and undermined confidence in the jury's verdict. See *People v. Harper*, 2013 IL App (1st) 102181,

¶ 49 ("where newly discovered evidence is both exonerating and contradicts the State's evidence at trial, it is capable of producing a different outcome at trial").

¶ 41 Therefore, Anthony's affidavit, taken as true, denied defendant's involvement in the offenses and refutes the State's evidence at trial. While Anthony's allegations may ultimately be deemed unworthy of belief, such a finding can be made "only at a third-stage evidentiary hearing." *Robinson*, 2020 IL 123849, ¶ 61. Therefore, defendant has made a substantial showing of actual innocence sufficient to advance his actual innocence claim to a third stage evidentiary hearing.

¶ 42 Accordingly, we reverse the dismissal of defendant's petition and remand to the circuit court for further proceedings under the Act.

¶ 43 Reversed and remanded.